# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DIRECT SUPPLY, INC.

    Plaintiff,

v.                                                            Case No.:

UNITED STATES OF AMERICA,

    Defendant.

## COMPLAINT

The plaintiff, Direct Supply, Inc., by its attorneys, Robert E. Dallman, Barry R. White, Matthew J. Thome and von Briesen & Roper, s.c., as and for its complaint against the defendant, United States of America, hereby alleges as follows:

## NATURE OF ACTION

1. This is a civil action against the United States for the recovery of internal revenue tax erroneously or illegally assessed or collected.

## PARTIES

2. The plaintiff, Direct Supply, Inc. ("Direct Supply"), is a citizen of Wisconsin that is incorporated under the laws of the State of Wisconsin and its principal place of business is located at 6767 N. Industrial Road, Milwaukee, WI 53223.

3. Direct Supply is a C corporation under 26 U.S.C. § 1361(a)(2).

4. The defendant is the United States of America.

## JURISDICTION AND VENUE

5. The court has jurisdiction in this matter pursuant to 28 U.S.C. § 1346(a)(1).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1402(a)(2) because this is the district in which Direct Supply's principal place of business is located. Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) in that the United States is the defendant, Direct Supply resides in this district and no real property is involved in the action.

## BACKGROUND

7. At all times during relevant tax years 2011-2015, and continuing today, Direct Supply was, and is, engaged in the trade or business of offering and selling more than a million items, including health care products, rehabilitation supplies, senior specific furnishings, and food service equipment, to the healthcare industry and to senior living providers. Senior living providers are frequently referred to in this complaint as "providers" because they "provide" senior living accommodations and services to their residents.

8. As part of its trade or business during tax years 2011-2015, and continuing today, Direct Supply offers senior living providers and their designated suppliers online access to Direct Supply's self-developed e-procurement software platform known as the DSSI software system ("DSSI" or the "DSSI Software"). It also provides senior living providers with access to Direct Supply's self-developed building management software known as the TELS software system ("TELS" or the "TELS Software"). DSSI is a cloud-based software platform used by senior living providers and their designated suppliers of goods in their procurement processes. Through their use of DSSI, the senior living providers purchase supplies from suppliers, and both the senior living providers and their suppliers are able to reduce various administrative burdens and costs of high volume purchasing which expands the potential for increased profitability and cost savings. Through their use of TELS, the senior living providers are able to manage many aspects of their individual locations, including scheduling preventative maintenance, tracking expenditures and

2

costs and documenting compliance with procedures and regulations applicable to senior living facilities.

## THE DSSI SOFTWARE

9. The DSSI Software is computer software that was developed by Direct Supply and is used by senior living providers to purchase goods and supplies and is also used by suppliers of those goods and supplies to sell them to the senior living providers.

10. The DSSI Software is not a database or information base.

11. Direct Supply produced, created, and developed the DSSI Software by employing software developers in the United States. The software developer employees spent the majority of their working time writing the machine-readable code composing the DSSI Software, updating that code and fixing system "bugs" for users.

12. Direct Supply's manufacture and production of its DSSI Software took place in whole or in significant part within the United States because substantially all of the work to develop and maintain the DSSI Software was performed by Direct Supply's employees in the United States.

13. The senior living providers (*i.e.*, the buyers of supplies) and suppliers (*i.e.*, the sellers of supplies) use the DSSI Software in their procurement processes. Use of the DSSI Software facilitates sales between provider/buyers and their designated supplier/sellers, reduces expensive manual work for both provider/buyers and supplier/sellers, and supports long-term customer relationships between provider/buyers and their designated supplier/sellers.

14. Both provider/buyers and supplier/sellers are granted access to use the DSSI Software by executing an agreement with Direct Supply. Provider/buyers and supplier/sellers access the DSSI Software for their direct use through their own internet connections.

15. Provider/buyers use DSSI to: (a) access and search a customer specific catalog of the goods and associated pricing they have under contract with their chosen supplier/sellers; and (b) electronically place purchase orders for such products. Supplier/sellers use DSSI to: (a) electronically accept purchase orders from provider/buyers; and (b) invoice provider/buyers for such purchases.

16. Provider/buyers also use the DSSI Software to run, view and customize purchasing reports, to view and analyze order tracking, and to create and perform spend management and budgeting.

17. Supplier/sellers further use the DSSI Software to electronically implement pricing and product updates, and to create, run, and view customized purchase order and invoice reporting and tracking.

18. Provider/buyers are required to have established contractual relationships with their designated suppliers prior to using the DSSI Software. Specifically, all negotiations regarding the type of products available for purchase, the pricing for such products, and the terms and conditions of payment occur solely between the provider/buyers and supplier/sellers, and are performed independently outside of the DSSI Software, without any involvement from Direct Supply's employees.

19. Neither provider/buyers nor supplier/sellers access the DSSI Software to obtain any service provided by Direct Supply. Direct Supply's employees do not match orders, execute invoices or purchase orders, route or reroute orders for provider/buyers or supplier/sellers, or perform any other function in the operation of the DSSI Software, although employees who work within Direct Supply's customer support function may, in rare, exceptional circumstances, manually fix errors or other issues with certain transactions.

20. In exchange for access and use of the DSSI Software, supplier/sellers agree to pay timely fees to Direct Supply based upon the volume of products and/or goods sold by supplier/sellers through their use of the DSSI Software, and certain provider/buyers pay separate fees to Direct Supply for access and use of the DSSI Software.

21. Direct Supply also derives revenue, embedded in the transaction fees paid by supplier/sellers, for providing customer support for routine troubleshooting or other technology-related issues.

## THE TELS SOFTWARE

22. The TELS Software is computer software that was developed by Direct Supply and used by senior living providers for property management.

23. The TELS Software is not a database or information base.

24. Direct Supply produced, created, and developed the TELS Software by employing software developers in the United States. The software developer employees spent the majority of their working time writing the machine-readable code composing the TELS Software, updating that code and fixing system "bugs" for users.

25. Direct Supply's manufacture and production of its TELS Software took place in whole or in significant part within the United States because substantially all of the work to develop and maintain the TELS Software was performed by Direct Supply's employees in the United States.

26. Senior living providers use the TELS Software to track and manage important equipment at the senior living providers' locations, schedule preventative maintenance procedures, ensure proper warranty utilization, and facilitate compliance with applicable procedures and documentation requirements for senior living buildings in the United States.

5

27. Senior living providers are granted access to use the TELS Software by executing an agreement with Direct Supply. Senior living providers access the TELS Software for their direct use through their own internet connections.

28. In accessing and using the TELS Software, senior living providers have no direct interaction with Direct Supply. At all relevant times, Direct Supply's employees did not provide property management services to senior living providers through the TELS Software. Senior living providers' personnel unilaterally manage their buildings through the TELS Software.

29. In exchange for access and use of the TELS Software, senior living providers agree to pay a fixed monthly fee for each building location utilizing the TELS Software.

26 U.S.C. § 199 DEDUCTION

30. 26 U.S.C. § 199 was created as part of the American Jobs Creation Act of 2004, Pub. L. No. 108-357. Under 26 U.S.C. § 199 (2004), as amended, Direct Supply is entitled to a deduction in an amount equal to 9% of the lesser of Direct Supply's (a) qualified production activities income for the taxable year, or (b) taxable income (determined without regard to section 199) for the taxable year.

31. Under 26 U.S.C. § 199, "qualified production activities income" means an amount equal to the excess of Direct Supply's domestic production gross receipts for the taxable year over the sum of the costs of goods sold that are allocable to such receipts, and other expenses, losses, or deductions which are properly allocable to such receipts.

32. Under 26 U.S.C. § 199, Direct Supply's "domestic production gross receipts" means Direct Supply's gross receipts derived from any lease, rental, license, sale, exchange, or other disposition of qualifying production property which was manufactured, produced, grown, or extracted by Direct Supply in whole or in significant part within the United States.

33. Under 26 U.S.C. § 199, "qualifying production property" means tangible personal property, sound recording, and any computer software.

34. Under Treasury Reg. 1.199-3(i)(6)(ii) gross receipts from providing customers access to online services are generally not considered gross receipts from the lease, rental, license, sale, exchange, or other disposition of computer software. However, under Treasury Reg. 1.199-3(i)(6)(iii)(B), gross receipts from providing customers access to online computer software through the internet are considered gross receipts from the lease, rental, license, sale, exchange, or other disposition of qualifying production property by the taxpayer if: (1) the taxpayer's customers are making direct use of the computer software while connected to the internet; (2) another taxpayer derives, on a regular and ongoing basis in its business, gross receipts from the lease, rental, license, sale, exchange or other disposition of software that is substantially identical to the taxpayer's online software; and (3) that other taxpayer provided the substantially identical software to its customers either affixed to a tangible medium or by allowing the customer to download the substantially identical software from the internet.

35. The deduction allowable to a taxpayer under 26 U.S.C. § 199 is limited to 50 percent of the W-2 wages of the taxpayer for the taxable year.

36. 26 U.S.C. § 199 was repealed by the Tax Cut and Jobs Act of 2017, Pub. L. No. 115-97, effective for tax years beginning after December 31, 2017.

## SUBSTANTIALLY IDENTICAL SOFTWARE

37. Persons other than Direct Supply license or sell computer software that performs the same procurement functions as the DSSI Software ("DSSI Comparable Software"), including computer software created and sold by Basware, Yardi, Ariba and perhaps others.

38. From a customer's perspective, the DSSI Comparable Software licensed or sold by persons other than Direct Supply has the same functional results as the DSSI Software in that both automate the provider/buyer's purchase of products by providing a catalog of available products, by electronically issuing a purchase order, by electronically generating an invoice for such order, and by capturing data for standard reports.

39. The DSSI Software and the DSSI Comparable Software have a significant overlap of features, including customer specific catalogs, product and pricing visibility, catalog search functions, contract document management, shopping lists for routine items, electronic purchase orders, electronic obtaining of any necessary approvals within the provider/buyer's organization, electronic invoices, and data capture for standard reports.

40. The DSSI Software and the DSSI Comparable Software have a significant overlap of purpose, in that both are designed to automate the process of buyers' purchase of products from select suppliers, at negotiated prices, by organizing the products into customer specific catalogs, issuing electronic purchase orders, electronically obtaining necessary approvals, issuing electronic purchase orders, and capturing data for budget and other standard reports.

41. The persons who develop, license and sell the DSSI Comparable Software derived gross receipts on a regular and ongoing basis from the lease, rental, license, sale, exchange or other disposition of their DSSI Comparable Software.

42. The DSSI Comparable Software licensed or sold by persons other than Direct Supply is provided to customers on a tangible medium or is downloaded by customers.

43. Accordingly, Direct Supply is entitled to a deduction, in accordance with 26 U.S.C. § 199 in connection with the DSSI Software for the taxable years at issue herein.

44. Persons other than Direct Supply license or sell computer software that performs the same property management functions as the TELS Software ("TELS Comparable Software"), including software known as Bigfoot, MPulse and perhaps others.

45. From a customer's perspective, the TELS Comparable Software licensed or sold by persons other than Direct Supply has the same functional results as the TELS Software in that both provide asset and equipment management, preventive and predictive maintenance management, work order management, inventory management, purchasing, and reporting.

46. The TELS Software and the TELS Comparable Software have significant overlap of features, including monitoring regulatory code compliance, maintenance scheduling and tracking, warranty tracking, repair tracking, interactive reporting, automated work order processing, and a smart phone app.

47. The TELS Software and the TELS Comparable Software have significant overlap of purpose, in that both are designed to organize and house vital information across multiple buildings for users, while permitting on-demand reports to provide a summary of overdue tasks, monitor productivity and compliance, and allow users to track expenditures and analyze costs.

48. The persons who develop, license and sell the TELS Comparable Software derived gross receipts on a regular and ongoing basis from the lease, rental, license, sale, exchange or other disposition of their TELS Comparable Software.

49. The TELS Comparable Software licensed or sold by persons other than Direct Supply is provided to customers on a tangible medium or is downloaded by customers.

50. The Internal Revenue Service determined, upon examination of Direct Supply's Amended U.S. Corporate Income Tax Return, that Bigfoot software was substantially identical to the TELS Software, and that Direct Supply's TELS Software otherwise qualified for a 26 U.S.C. § 199 deduction with respect to Direct Supply's qualified production activities income related to the TELS Software.

51. Accordingly, Direct Supply is entitled to a deduction, in accordance with 26 U.S.C. § 199, in connection with the TELS Software for the taxable years 2011-2013.

## COUNT ONE:
## CLAIM FOR REFUND OF FEDERAL INCOME TAX ERRONEOUSLY OR ILLEGALLY ASSESSED AND COLLECTED FOR THE TAX YEAR ENDING DECEMBER 31, 2011

52. Direct Supply incorporates by this reference the allegations contained in paragraphs 1 through 51 of its Complaint.

53. For the tax year ending December 31, 2011, based on Direct Supply's gross receipts from the lease, rental, license, sale, exchange or other disposition of qualifying production property (*i.e.*, providing access to both the DSSI Software and the TELS Software), its cost of goods sold related to those gross receipts, its other expenses, losses or deductions which are properly allocable to such receipts, its taxable income (determined without regard to 26 U.S.C. § 199) and its W-2 wages, Direct Supply is entitled to a deduction of $1,536,827 for the tax year ending December 31, 2011.

54. On December 21, 2015, Direct Supply filed an Amended U.S. Corporation Income Tax Return, Form 1120X, for the tax year ending December 31, 2011 claiming the $1,536,827 deduction and claiming a refund of $583,995.

55. On June 3, 2019, the Internal Revenue Service issued a notice disallowing Direct Supply's claim for refund for the tax year ending December 31, 2011.

56. Direct Supply is entitled to a refund of tax erroneously collected for the tax year ending December 31, 2011 in the amount of $583,995.

57. Direct Supply is entitled to interest on this amount pursuant to 26 U.S.C. § 6611.

**COUNT TWO:**
**CLAIM FOR REFUND OF FEDERAL INCOME TAX ERRONEOUSLY OR ILLEGALLY ASSESSED AND COLLECTED FOR THE TAX YEAR ENDING DECEMBER 31, 2012**

58. Direct Supply incorporates by this reference the allegations contained in paragraphs 1 through 57 of its Complaint.

59. For the tax year ending December 31, 2012, based on Direct Supply's gross receipts from the lease, rental, license, sale, exchange or other disposition of qualifying production property (*i.e.*, providing access to both the DSSI Software and the TELS Software), its cost of goods sold related to those gross receipts, its other expenses, losses or deductions which are properly allocable to such receipts, its taxable income (determined without regard to 26 U.S.C. § 199) and its W-2 wages, Direct Supply is entitled to a deduction of $2,120,862 for the tax year ending December 31, 2012.

60. On December 21, 2015, Direct Supply filed an Amended U.S. Corporation Income Tax Return, Form 1120X, for the tax year ending December 31, 2012 claiming the $2,120,862 deduction and claiming a refund of $742,301.

61. On June 3, 2019, the Internal Revenue Service issued a notice disallowing Direct Supply's claim for refund for the tax year ending December 31, 2012.

62. Direct Supply is entitled to a refund of tax erroneously collected for the tax year ending December 31, 2012 in the amount of $742,301.

63. Direct Supply is entitled to interest on this amount pursuant to 26 USC § 6611.

## COUNT THREE:
## CLAIM FOR REFUND OF FEDERAL INCOME TAX ERRONEOUSLY OR ILLEGALLY ASSESSED AND COLLECTED FOR THE TAX YEAR ENDING DECEMBER 31, 2013

64. Direct Supply incorporates by this reference the allegations contained in paragraphs 1 through 63 of its Complaint.

65. For the tax year ending December 31, 2013, based on Direct Supply's gross receipts from the lease, rental, license, sale, exchange or other disposition of qualifying production property (*i.e.*, providing access to both the DSSI Software and the TELS Software), its cost of goods sold related to those gross receipts, its other expenses, losses or deductions which are properly allocable to such receipts, its taxable income (determined without regard to 26 U.S.C. § 199) and its W-2 wages, Direct Supply is entitled to a deduction of $1,635,933 for the tax year ending December 31, 2013.

66. On December 21, 2015, Direct Supply filed an Amended U.S. Corporation Income Tax Return, Form 1120X, for the tax year ending December 31, 2013 claiming the $1,635,933 deduction and claiming a refund of $621,654.

67. On June 3, 2019, the Internal Revenue Service issued a notice disallowing Direct Supply's claim for refund for the tax year ending December 31, 2013.

68. Direct Supply is entitled to a refund of tax erroneously collected for the tax year ending December 31, 2013 in the amount of $621,654.

69. Direct Supply is entitled to interest on this amount pursuant to 26 U.S.C. § 6611.

# COUNT FOUR:
# CLAIM FOR REFUND OF FEDERAL INCOME TAX ERRONEOUSLY OR ILLEGALLY ASSESSED AND COLLECTED FOR THE TAX YEAR ENDING DECEMBER 31, 2014

70. Direct Supply incorporates by this reference the allegations contained in paragraphs 1 through 69 of its Complaint.

71. For the tax year ending December 31, 2014, based on Direct Supply's gross receipts from the lease, rental, license, sale, exchange or other disposition of qualifying production property (*i.e.*, providing access to the DSSI Software), its cost of goods sold related to those gross receipts, its other expenses, losses or deductions which are properly allocable to such receipts, its taxable income (determined without regard to 26 U.S.C. § 199) and its W-2 wages, Direct Supply is entitled to a deduction of $1,836,835 for the tax year ending December 31, 2014.

72. Direct Supply claimed this deduction on its Form 1120 for the tax year ending December 31 2014 when it timely filed that return on September 14, 2015.

73. The Internal Revenue Service examined Direct Supply's Form 1120 for the tax year ending December 31 2014. The Internal Revenue Service issued a Notice of Deficiency dated June 3, 2019.

74. The Notice of Deficiency disallowed the 26 U.S.C. § 199 deduction for Direct Supply's qualified production activities income for the tax year ending December 31, 2014.

75. The Notice of Deficiency asserted an income tax deficiency for the tax year ending December 31, 2014 in the amount of $642,892.

76. Direct Supply did not file a petition in the U.S. Tax Court in response to the Notice of Deficiency.

77. Direct Supply paid additional income tax of $642,892 plus interest of $137,834 to the Internal Revenue Service for the tax year ending December 31, 2014 on July 19, 2019.

78. On October 22, 2019, Direct Supply filed an Amended U.S. Corporate Income Tax Return, Form 1120X, for the tax year ending December 31, 2014 claiming a refund of $780,726 for tax and interest erroneously assessed and collected with respect to the tax year ending December 31, 2014.

79. Direct Supply requested that if the IRS intended to disallow the claim for refund, it do so at the earliest possible time so that Direct Supply could file suit in the United States District Court. The IRS has not yet disallowed the claim for refund and more than six months have now elapsed since filing the Form 1120X for the tax year ending December 31, 2014 and, therefore, pursuant to 26 U.S.C. § 6532(a)(1), Direct Supply is entitled to commence this proceeding.

80. Direct Supply is entitled to a refund of tax and interest erroneously collected for the tax year ending December 31, 2014 in the amount of $780,726.

81. Direct Supply is entitled to interest on this amount pursuant to 26 U.S.C. § 6611.

**COUNT FIVE:**
**CLAIM FOR REFUND OF FEDERAL INCOME TAX ERRONEOUSLY OR ILLEGALLY ASSESSED AND COLLECTED FOR THE TAX YEAR ENDING DECEMBER 31, 2015**

82. Direct Supply incorporates by this reference the allegations contained in paragraphs 1 through 81 of its Complaint.

83. For the tax year ending December 31, 2015, based on Direct Supply's gross receipts from the lease, rental, license, sale, exchange or other disposition of qualifying production property (*i.e.*, providing access to the DSSI Software), its cost of goods sold related to those gross receipts, its other expenses, losses or deductions which are properly allocable to such receipts, its taxable income (determined without regard to 26 U.S.C. § 199) and its W-2 wages, Direct Supply is entitled to a deduction of $1,648,795 for the tax year ending December 31, 2015.

84. Direct Supply claimed this deduction on its Form 1120 for the tax year ending December 31, 2015 when it timely filed that return on September 7, 2016.

85. The Internal Revenue Service examined Direct Supply's Form 1120 for the tax year ending December 31 2015. The Internal Revenue Service issued a Notice of Deficiency dated June 3, 2019.

86. The Notice of Deficiency disallowed the 26 U.S.C. § 199 deduction for Direct Supply's qualified production activities income for the tax year ending December 31, 2015.

87. The Notice of Deficiency asserted an income tax deficiency for the tax year ending December 31, 2015 in the amount of $626,541.

88. Direct Supply did not file a petition in the U.S. Tax Court in response to the Notice of Deficiency.

89. Direct Supply paid additional income tax of $626,541 plus interest of $107,711 to the Internal Revenue Service for the tax year ending December 31, 2015 on July 19, 2019.

90. On October 22, 2019, Direct Supply filed an Amended U.S. Corporate Income Tax Return, Form 1120X, for the tax year ending December 31, 2015 claiming a refund of $734,252 for tax and interest erroneously assessed and collected with respect to the tax year ending December 31, 2015.

91. Direct Supply requested that if the IRS intended to disallow the claim for refund, it do so at the earliest possible time so that Direct Supply could file suit in the United States District Court. The IRS has not yet disallowed the claim for refund and more than six months have now elapsed since filing the Form 1120X for the tax year ending December 31, 2015 and, therefore, pursuant to 26 U.S.C. § 6532(a)(1), Direct Supply is entitled to commence this proceeding.

92. Direct Supply is entitled to a refund of tax and interest erroneously collected for the tax year ending December 31, 2015 in the amount of $734,252.

93. Direct Supply is entitled to interest on this amount pursuant to 26 U.S.C. § 6611.

WHEREFORE, the plaintiff demands judgment in the amount of $3,462,928 plus interest pursuant to 26 U.S.C. § 6611, plus costs and fees allowed pursuant to 26 U.S.C. § 7430, and all other relief to which the plaintiff is entitled at law or in equity.

Dated this 17th day of July, 2020.

                                                                               von Briesen & Roper, s.c.
                                                                               *Attorneys for Direct Supply, Inc.*

                                                                       By:   s/ Barry R. White
                                                                              Robert E. Dallman
                                                                               State Bar No. 1002890
                                                                               Barry R. White
                                                                               State Bar No. 1020117
                                                                               Matthew J. Thome
                                                                               State Bar No. 1113463

Address:

von Briesen & Roper, s.c.
411 E. Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
E-mail:       rdallman@vonbriesen.com
                   bwhite@vonbriesen.com
                   mthome@vonbriesen.com

Telephone:    414-287-1285 (Dallman)
                        414-270-2516 (White)
                        414-287-1433 (Thome)

34471810_2